# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### 5:03-CV-137-MU

| | | |
|---|---|---|
| **NATHAN WAYNE BOWIE** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **MARVIN POLK, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina** | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

THIS MATTER is before the Court upon Petitioner Nathan Wayne Bowie's (hereinafter "Petitioner" or "Bowie") Petition for Writ of Habeas Corpus (hereinafter "PWHC" or "Petition") filed pursuant to 28 U.S.C. § 2254. Also before the Court is the State's Motion for Summary Judgment[1], Petitioner's August 6, 2004 Motion to Amend his Petition by Interdelineation, Petitioner's Motion for Discovery, Petitioner's Motion to Continue Consideration of the State's Motion for Summary Judgment, Petitioner's Motion for Leave to File a Substitute Affidavit of Steven R. Edelstein, and Petitioner's September 16, 2004 Motion for Leave to file a Second Amendment by Interdelineation.

## FACTS

On July 22, 1991, Bowie was indicted for the first-degree murders of Calvin Lee Wilson and Nelson Roger Shuford. Bowie was tried capitally, along with co-defendant William Barfield Bowie, at the 11 January 1993 Criminal Session of Superior Court, Catawba County, before the Honorable Julia V. Jones, Judge Presiding, and subsequently due to the illness of the Honorable

---

[1]Although the Warden of Central Prison is the named Respondent in this matter, the Court refers to the Respondent throughout this Order as "the State."

Julia V. Jones before the Honorable Forrest A. Ferrell, Judge Presiding to the conclusion of the trial. Bowie was represented by W. Thomas Portwood, Jr. and Mark Killian.

At trial, the State's evidence tended to show that, on May 23, 1991, at around 11 o'clock p.m. or 12 o'clock a.m., Nathan Bowie's uncle, William Barfield Bowie (hereinafter "William" or "W. Bowie"), and his aunt, Rochelle Bowie,[2] approached Nelson Shuford and Calvin Wilson. An argument ensued between Rochelle and Shuford. Rochelle and William left, walked down the street, and a shot was fired from behind them. There was testimony that Calvin Wilson shot his gun into the air but that Rochelle and William believed that Shuford and Wilson were shooting at them. There was testimony that Rochelle shouted back at Shuford and Wilson, "y'all be some dead asses when I come back." Returning to Rochelle's residence, William tried to contact Bowie. Reaching Bowie's mother, Joan Hunt, William told her that if she saw Bowie, to tell him to come to Rochelle's residence. Shortly thereafter, Bowie arrived, armed with a .45 caliber hand gun. William told Bowie that he had called Bowie's house looking for him. Bowie responded, "I know, man, I had a funny feeling something was going to go down so I brought the gun." William produced a .25 caliber hand gun and checked it for bullets. Bowie told William, "I know where he live[s]. He live[s] in Newton." Bowie and William left Rochelle's apartment. At around 2:00 a.m. on May 24, 1991, a neighbor of Nelson Shuford's saw Bowie's truck outside Shuford's apartment in Newton.

Bowie and William left Rochelle's residence a second time on the morning of May 24, 1991. At 8:00 a.m., a man identifying himself as "Neal" from Charlotte appeared at Shuford's Newton residence and began banging on the door and calling for Shuford. Told that Shuford was

---

[2]William, Rochelle and Joan Hunt, Nathan Bowie's mother, are siblings.

not at home, he became angry and began cursing. He got in a truck and sped out of the parking lot. Three witnesses, two of whom knew Bowie from highschool, identified Bowie as the man beating on the door of Shuford's residence. They also identified the truck in which he left as belonging to Bowie. Approximately two hours later, Wilson and Shuford were standing and socializing under a tree with four others in the yard of Phillip Link. Bowie and William came from behind a building and approached the group. Bowie and William began firing, killing Shuford and Wilson. There was testimony that at least one of the victims said something to Bowie and William before they began shooting.

Shuford was shot once in the chest. There was testimony that the wound was made by a large caliber bullet. He died instantly. Shuford did not move toward Bowie or William before they began firing. Wilson was shot twice – in the right upper back and in the head, above his right ear. After Wilson had fallen, one of the shooters approached to within six or seven feet and fired at him as he lay on the ground. No bullet was recovered for the head wound, which was the fatal wound. A .25 caliber bullet was recovered from Wilson's right chest area. There was testimony that the entrance wound in the head was larger than the entrance wound in the back. Wilson was lying on his side, alive but unconscious, when police arrived. He died at the hospital several days later.

Three .45 caliber casings, all fired from the same gun, were found at the scene. There was testimony that one of the shooters was firing a .45. Two .25 caliber casings, fired from the same gun, also were found at the scene. The State's firearms expert testified that although he could not confirm that a third .25 caliber casing found at the scene was fired from the same gun as the other two .25 shells, he could confirm that it was worked through the action of the same firearm that fired the other two .25 shells. No weapons were found on either Shuford or Wilson. A .22

caliber handgun was found in the closed trunk of Wilson's car where he typically kept it. The guns used in the shootings were not recovered by police.

Within minutes of the shootings, Bowie and William picked up Rochelle and her children at a friend's apartment and took them to Bowie's mother's house. Bowie and William then fled to Philadelphia, Pennsylvania.

The jury found Bowie and William guilty of both counts of first-degree murder under the theory of acting in concert. At the capital sentencing proceeding, the defense presented the testimony of six witnesses: Bowie's mother, Joan Hunt, social worker, Joanne Sigmon, two of Bowie's highschool football coaches, his high school principal and his eighth grade teacher. Before considering the aggravating factors submitted by the State, the jury was required to answer the following Special Issue for each murder:

> Do you unanimously find from the evidence, beyond a reasonable doubt, that the defendant himself: Killed or attempted to kill the victim, [Wilson/Shuford]; or Intended to kill the victim, [Wilson/Shuford].

The jury answered "Yes" to each Special Issue. The jury found two aggravating factors to exist for each murder:[3] that the defendant killed (or intended to kill) the victim while he was an aider or abettor in the commission of, or an attempt to commit, or flight after commission or attempting to commit, any homicide by another person; and the murder for which the defendant was convicted was part of a course of conduct which included the commission by the defendant of other crimes of violence against another person or persons. *See* N.C. Gen. Stat. § 15A-2000(e)(5) & (11). The jury was asked to consider fifteen (15) mitigating circumstances for each murder, including

---

[3]The jury rejected the aggravating factor that the murder of Calvin Lee Wilson was committed for the purpose of avoiding a lawful arrest. *See* N.C. Gen. Stat. § 15A-2000(e)(4).

two statutory mitigating circumstances. One or more jurors found the same ten (10) mitigating circumstances to exist in each case, including the statutory mitigating circumstance that the defendant had no significant history of prior criminal activity. *See* § 15A-2000(f)(1). No juror found the statutory catch-all "any other circumstance or circumstances arising from the evidence which one or more of you deems to have mitigating value" to exist. *See* § 15A-2000(f)(9). The jury recommended a sentence of death for both first-degree murder convictions, and the trial court entered judgment in accordance with those recommendations.

## PROCEDURAL HISTORY

Bowie filed a direct appeal to the North Carolina Supreme Court challenging his convictions and death sentences. The North Carolina Supreme Court affirmed his conviction and sentences of death on May 5, 1995. *See State v. Bowie*, 456 S.E.2d 771 (N.C. 1995). The United States Supreme Court denied Bowie's Petition for Writ of Certiorari. *See Bowie v. North Carolina*, 516 U.S. 994, 116 S.Ct. 529 (1995).

On May 20, 1996, Bowie filed a Motion for Appropriate Relief (hereinafter "MAR") in the Superior Court, Catawba County. He filed Motions to Amend his MAR on February 12, 1997 (First), June 23 1997 (Second), April 28, 2000 (Third), July 21, 2000 (Fourth) and August 30, 2000 (Fifth). The State filed its Answer on April 27, 2001.

On July 19, 2001, the MAR court held a hearing on Bowie's outstanding discovery motions. The Honorable Raymond A. Warren, Superior Court Judge Presiding, issued an Order allowing Bowie discovery of confidential Catawba County Department of Social Services (hereinafter "DSS") records, confidential North Carolina DSS records, and certain confidential Catawba County Sheriff's Department records containing information regarding the sexual abuse

of certain juveniles at Sipes Orchard Home for Boys. The MAR court denied Bowie's motion to depose trial counsel prior to the evidentiary hearing on his MAR.

The MAR court held an evidentiary hearing on Bowie's MAR beginning on October 8, 2001 and concluding on October 17, 2001. The Honorable Michael E. Helms, Superior Court Judge, presided. The MAR court issued an Order on July 18, 2002, denying the MAR and subsequent Amendments to the MAR.

On September 16, 2002, Bowie filed a Petition for Writ of Certiorari in the North Carolina Supreme Court. It was denied on November 21, 2002. *See State v. Bowie*, 572 S.E.2d 789 (NC 2002). The United State's Supreme Court denied Bowie's subsequent Petition for Writ of Certiorari on June 27, 2003. *See Bowie v. North Carolina*, 539 U.S.___, 123 S.Ct. 2640, 156 L.Ed.2d 660 (2003).

Bowie filed the instant Petition for Writ of Habeas Corpus on October 24, 2003. The State filed its Response and Motion for Summary Judgment on August 5, 2004. On August 6, 2004, Bowie filed a Motion to Amend his Petition by Interdelineation and a Motion for Discovery. On September 13, 2004, Bowie filed a Motion to Continue Consideration of the State's Motion for Summary Judgment until discovery has been conducted. Additionally, Bowie filed a Response to the State's Motion for Summary Judgment and an Affidavit of Steven R. Edelstein. On September 15, 2004, Bowie filed a Motion for Leave to File a Substitute Affidavit of Steven R. Edelstein. On September 16, 2004, Bowie filed a Motion for Leave to file a Second Amendment by Interdelineation. On November 19, 2004, Bowie filed a Motion to Defer Ruling on the Petition for Writ of Habeas Corpus pending the United State's Supreme Court's ruling in *Rompilla v. Horn,* 355 F.3d. 233 (3rd Cir. 2004) *cert. granted, sub. nom. Rompilla v. Beard*, No.

04-5462.  The Court dismissed that Motion as moot on August 19, 2005.

DISCUSSION

LEGAL STANDARDS

A.  *Standard of Review under The Antiterrorism and Effective Death Penalty Act of 1996*

For those of Bowie's claims adjudicated on the merits by the North Carolina courts, this court's review is limited by the deferential standard of review set forth in The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), 28 U.S.C. § 2254, as interpreted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  This court may not grant federal habeas relief unless the North Carolina court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

In *Williams*, the Supreme Court described two ways in which a state court decision will be "contrary to" clearly established Federal precedent within the meaning of § 2254(d)(1). 529 U.S. at 405-06.  A state court decision will fall under the "contrary to" clause if the state court "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Id.*  In either of those scenarios, a Federal habeas court would be unconstrained by § 2254(d)(1) because the state court decision would fall within the § 2254 (d)(1) "contrary to" clause.  *Id.* at 406.

A state court decision involves an unreasonable application of clearly established law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.  The Supreme Court also made it clear that an

unreasonable application of federal law differs from an incorrect application of federal law. *Id.* at 410. Thus, "under 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id* at 411. In deciding whether a state court's application of clearly established federal law is unreasonable within the meaning of § 2254(d), a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams,* 529 U.S. at 409.

## B. Harmless Error Analysis

If this Court finds that trial error rising to the level of a constitutional violation occurred, the error must then be evaluated under the standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Under the *Brecht* standard, a reviewing court must determine whether the constitutional error had a "substantial or injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). The *Brecht* standard is rooted in the federal harmless-error statute, 28 U.S.C. § 2111. *Brecht*, 507 U.S. at 638. Under the *Brecht* standard, "habeas petitioners obtain plenary review of constitutional claims, but cannot receive habeas relief based on trial error unless they establish that the error resulted in "actual prejudice." *Id.* (citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)).

# ANALYSIS OF PETITIONER'S CLAIMS

*Petitioner's Motion to Amend*

On August 6, 2004, Petitioner filed a motion to amend his Petition by Interdelineation pursuant to Rule 11 of the Rules Governing § 2254 Proceedings and Rule 15(a) (b) and (d) of the Federal Rules of Civil Procedure. Specifically, Petitioner moves to amend his Petition by inserting the following language:

> c1: Subsequent to the MAR hearing, Mr. Portwood admitted drinking during the day, that he was drunk in court, and during conferences with clients.

On September16, 2004, Petitioner filed a Second Motion to Amend in which he seeks to substitute the second motion for the one described above. In his second motion to amend, Petitioner seeks to amend his Petition by inserting the following:

> VII: Petitioner was denied a full and fair State court proceeding

> 46.1 Petitioner alleges that he was not provided a full and fair hearing in State court for the following reasons:

>> i. Petitioner was denied a deposition and other discovery in State court with respect to W. Thomas Portwood's alcoholism.

>> ii. The State order denying Petitioner's Motion for Appropriate Relief (MAR) relied heavily on the credibility of lead counsel W. Thomas Portwood's claimed recollection of a strategy to not investigate Petitioner's background so as not to learn anything bad about their client.

>> iii. W. Thomas Portwood's post-MAR deathbed statement to nurse Anita Anderson in which he admitted to drinking during working hours and destroying the lives of his clients is evidence that Portwood was not truthful in his testimony at Petitioner's MAR hearing.

>> iv. As described elsewhere, counsel for the State of North Carolina prepared the 100 page proposed order without instructions from the judge and without ever having read the Petitioner's proposed

order and contentions. As a result, the order adopted by the State
court denying Petitioner's MAR never addressed the major
arguments of the Petitioner: the utilization of William Bowie's
statement, admitted error, for the purposes of the sentencing
hearing; the utilization of Rochelle Bowie's statement in the
sentencing hearing; and the failure to consider the application of
*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d
389 (2000), to Petitioners' IAC claims; and failure to consider
cumulative prejudice.

Petitioner's motions to amend are based upon testimony given by a nurse from The Brian
Center, a facility in Hickory where Portwood received care prior to his death, at the MAR
proceedings of another former client of Portwood's.[4] The nurse, Anita Anderson, testified that
several hours before his death, Portwood told her that, among other things, he was drunk on
numerous occasions when he went into the courtroom, that he began drinking early in the
morning and that he continued to drink throughout the day, that he would go home in the
afternoon and pass out, and that he would wake up the next morning and start all over again. She
also testified that Portwood did not specify a time period when this behavior was occurring, and
he did not name any clients that he represented when this behavior was occurring. Portwood died
less than three hours after the conversation. Questioned about his decades-long, chronic
alcoholism, Portwood testified during Bowie's MAR hearing that he never drank alcohol during
the day when representing Bowie.

A habeas petition "may be amended . . . as provided in the rules of procedure applicable to
civil actions." 28 U.S.C. § 2242. Rule 11 of the Rules Governing § 2254 Cases states that, "[t]he
Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory
provisions or these rules, may be applied to a proceeding under these rules." (As amended Apr.

---

[4]The testimony was given in the post-conviction proceeding of <u>State v. Watson</u>, Catawba
County, 90 CRS10796.

26, 2004, eff. Dec. 1, 2004).  Rule 15(a) of the Federal Rules of Civil Procedure provides, "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Leave to amend may be denied on the grounds of "bad faith, undue prejudice to the opposing party, or futility of amendment." *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.1980).  Motions to Amend § 2254 habeas petitions are subject to the statute of limitations applicable to § 2254. *See* 28 U.S.C. § 2244(d)(1).

The Court takes judicial notice of the fact that Portwood died on May 30, 2003.[5]  The AEDPA's one year statute of limitations began to run for Petitioner's amendments on or about May 30 2003, the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."[6] § 2244(d)(1)(D).  Because the statute of limitations to raise claims based upon Portwood's deathbed statement expired on or about May 30, 2004, Petitioner's August 6 and September 16, 2004 motions to amend are untimely. *See id*.

When proposed amendments are barred by the statute of limitations, Rule 15(c) provides for the relation back of amendments to the original pleading under certain circumstances.  *See U.S. v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000) (citing Fed.R.Civ.P. 15(c)(2)).  Relation back

---

[5]The MAR court denied Bowie's MAR on July 18, 2002.

[6]The Court *sua sponte* ordered both parties to address the issue of timeliness because the State did not raise it as a defense to the proposed amendments.  *See Day v. McDonough*, __ U.S. __, 126 S.Ct. 1675, 1684 (2006) ("[D]istrict courts are permitted, . . . , to consider *sua sponte*, the timeliness of a state prisoner's habeas petition").  Petitioner did not address the timeliness issue other than to state that the amendments were timely because he could not have discovered this information until after his MAR was denied.

is permitted when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth ... in the original pleading." Fed.R.Civ.P. 15(c)(2). "The 'original pleading' to which Rule 15 refers is the complaint in an ordinary civil case, and the petition in a habeas proceeding." *Mayle v. Felix*, __ U.S. __, 125 S.Ct. 2562, 2569-70, 162 L.Ed.2d 582 (2005).

Petitioner's August 6, 2004 amendment does not relate back to the original pleading. There are no claims in the instant Petition alleging that Portwood was drunk in court during his representation of Bowie or that he drank during the day while representing Bowie or that he was drunk during conferences with Bowie. Therefore, Petitioner's August 6, 2004 Motion to Amend by Interdelineation is DENIED.

The Court will assume without deciding that Petitioner's September 16, 2004 Motion to Amend to add a claim that he was denied a full and fair MAR hearing does relate back to allegations in the Petition that Portwood's MAR testimony was not credible. Nevertheless, the Court will deny the Motion to Amend on futility grounds. *See Foman*, 371 U.S. at 182.

Under 28 U.S.C. § 2254, a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Bowie is not in custody because his MAR proceedings were unfair, he is in custody because he was tried, convicted and sentenced to death at a criminal trial. Therefore, because Bowie's amendment alleges errors only in the state post-conviction proceeding and not the constitutionality of his conviction and sentence, it cannot provide a basis for federal habeas relief. *See Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir. 1998) (citing *Bryant v. Maryland*, 848 F.2d

492, 493 (4ᵗʰ Cir. 1988) ("[C]laims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief")). At most, an unfair state court proceeding might warrant an evidentiary hearing in this Court on Bowie's IAC at sentencing claim.

Subject to narrow exceptions, no hearing is permitted if a petitioner "failed to develop the factual basis of a claim in State court proceedings." 28 USC § 2254(e)(2). "A failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault attributable to the [petitioner] or the [petitioner's] counsel." *Robinson v. Polk*, 438 F.3d 350, 367 (4ᵗʰ Cir. 2006) (citing *(Michael) Williams v. Taylor*, 529 U.S. 420, 432, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000)). There is no credible argument that Bowie did not diligently attempt to show that counsel's testimony at the MAR hearing regarding a sentencing strategy was not credible and that one of the contributing factors to that lack of credibility was counsel's chronic, severe alcoholism. As such, a hearing on this issue is not prohibited under § 2254(e)(2).

The fact that Bowie is not barred from receiving an evidentiary hearing in this Court does not mean that he is entitled to one. "A district court may grant an evidentiary hearing in a § 2254 case only where the petitioner has 'allege[d] additional facts, that, if true, would entitle him to relief" and has "establish[ed] one of the six factors set forth in *Townsand v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745 9 L.Ed.2d 770 (1963).' "⁷ *Robinson*, 438 F.3d at 368 (citing *Fullwood v. Lee*,

---

⁷The six *Townsend* factors are as follows:
(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

290 F.3d 663, 681 (4th Cir. 2002)).  Assuming without deciding that Bowie has established one or more of the Townsand factors, he has not alleged any "additional facts, that, if true, would entitle him to relief." *Id*.

In his proposed amendment, Bowie asserts that "Petitioner was denied a deposition and other discovery in State court with respect to W. Thomas Portwood's alcoholism."  That assertion appears in the original Petition and goes only to the issue of whether Bowie has established one of the *Townsand* factors.  Bowie also asserts that "[t]he State order denying Petitioner's . . . (MAR) relied heavily on the credibility of lead counsel W. Thomas Portwood's claimed recollection of a strategy to not investigate Petitioner's background so as not to learn anything bad about their client."  This assertion appears in several of Bowie's pleadings in support of his argument that the MAR court's determination that counsel were not deficient was an unreasonable determination of the facts in light of the evidence.  Additionally, Bowie asserts that the Order adopted by the State court denying Petitioner's MAR failed to address certain arguments raised in his MAR.  Not only does this assertion appear in several of Bowie's pleadings, it pertains only to the reasonableness of the MAR court's conclusions.

Finally, Bowie asserts that "W. Thomas Portwood's post-MAR deathbed statement to nurse Anita Anderson in which he admitted to drinking during working hours and destroying the lives of his clients is evidence that Portwood was not truthful in his testimony at Petitioner's MAR hearing."  The trustworthiness of Portwood's testimony goes only to whether Bowie received a fair hearing in state court. *See Townsand*, 372 U.S. at 312.[8]  Portwood's admission to drinking

---

*Fullwood*, 290 F.3d at 681 n. 7 (internal quotation marks omitted).

[8]Petitioner may argue that Portwood's deathbed admission entitles him to relief on his IAC claim because Portwood's untrustworthiness proves that the MAR court's determination that

during working hours, if true, does not entitle Bowie to relief on his IAC at sentencing claim. Although the Court in no way seeks to minimize the seriousness of Portwood's admitted alcoholism, whether he drank during the day has no bearing on whether he conducted a constitutionally inadequate sentencing investigation. In his Petition, Bowie does not contend or allege that Portwood's alcoholism rendered his performance at trial or at sentencing ineffective. For example, he does not allege that Portwood failed to conduct an adequate sentencing investigation because he was impaired by alcohol. Nor does he allege that Portwood failed, for example, to seek a limiting instruction on the admissibility of William Bowie's statement because he was impaired during the trial. Instead, the Petition presents Portwood's alcoholism as relevant only to his credibility during the MAR hearing. As such, evidence that Portwood drank during the day does not entitle Bowie to relief on any of his habeas claims. Because Petitioner's proposed amendment does not entitle him to any sort of relief, the Court will deny his motion to amend as futile. *See Foman*, 371 U.S. at 182.

*CLAIM I: Ineffective Assistance of Counsel Surrounding Admission of William Bowie's Confession*

Petitioner claims that counsel were ineffective for failing to object to the admission at trial of co-defendant William Bowie's confession to police. (PWHC pp. 7; 22; 23-24; 27) Petitioner claims further that counsel were ineffective for failing to request a limiting instruction to the jury that William's statement could not be used against Bowie. (PWHC pp. 7; 23) Petitioner asserts

---

counsel were not deficient was an unreasonable determination of the facts in light of the evidence. However, " '[i]n assessing the reasonableness of the state court's application of federal law, . . ., the federal courts are to review the *result* that the state court reached, not 'whether [its decision] [was] well reasoned.' " *Robinson v. Polk*, 438 F.3d at 358 (citations omitted).

that but for counsel's failure to object to admission of the statement and counsel's failure to

secure a limiting instruction, he would not have been sentenced to death.[9] Petitioner complains

that although the MAR court addressed these alleged errors in the context of the guilt/innocence

phase of the trial, the court failed to address how these alleged errors affected the sentencing

phase of the trial. (PWHC pp. 7; 21, 26; 27) The State asserts that these claims, as they pertain

to sentencing, are unexhausted in the State courts and would be procedurally barred there if

Petitioner attempted to raise them now. The State contends that they are procedurally defaulted

on federal habeas review.

Ordinarily, a federal habeas court will not review a claim that is procedurally defaulted,

absent a showing of cause and prejudice or a fundamental miscarriage of justice to excuse the

procedural default. *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998) (citing *Coleman v.

Thompson*, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (holding that a claim

dismissed on a state procedural rule is procedurally barred on federal habeas review). Generally,

a claim will be defaulted if the claim was not presented to all appropriate state courts and an

adequate and independent state procedural rule would now bar review. *See Clagett v. Angelone*,

209 F.3d 370, 378 (4th Cir. 2000), *cert. denied* 530 U.S. 1285 (2000).

In order to fully exhaust a claim in the state courts, a petitioner must "fairly present" his

---

[9]In light of the State's lengthy Response and Motion for Summary Judgment that addresses a number of claims raised in the MAR but not in the instant Petition, the Court notes that Petitioner clarifies in his Reply and in his Brief in Response to the State's Motion for Summary Judgment that he is *not* raising any issue concerning the guilt-innocence phase of the trial except as the evidence introduced affected the sentencing hearing. (Pet.'s Reply to State's Answer and Brief in Opposition to the State's Mot. for SJ, p. 18) Additionally, unlike in the MAR, in the instant Petition, Bowie does not raise an ineffective assistance of appellate counsel claim with regard to admission of William Bowie's confession.

claim to all appropriate state courts. *See Matthews v. Evatt*, 150 F.3d 907, 911 (4th Cir. 1997). "Fair presentation" requires that a petitioner present "both the operative facts and the 'controlling legal principles' " underlying the claim. *Id*. (citations omitted). The controlling legal principals governing the instant claim are articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 476 (1968), and its progeny.

In *Strickland*, the Supreme Court adopted a two-pronged test to determine whether "counsel's assistance was so defective as to require reversal of a conviction or death sentence." 466 U.S. at 687. Petitioner must first show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the Defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687-88.

In *Bruton*, the United States Supreme Court held that, a defendant is deprived of his rights under the Confrontation Clause when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. *See Richardson v. Marsh*, 481 U.S. 200, 207, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Richardson*, however, the Supreme Court held that the admission of a non-testifying co-defendant's confession is permissible if the confession is redacted to eliminate any reference to the non-confessing defendant, and it is accompanied by an appropriate limiting instruction that the confession is to be used only against the confessor. 481 U.S. at 211. As such, in order to survive scrutiny under *Bruton* and *Richardson*, a co-defendant's confession must be properly sanitized before it is admitted, and it must be accompanied by an appropriate limiting instruction. *See id*.

In his MAR, Bowie set forth three ineffective assistance of counsel (hereinafter sometimes "IAC") sections, one each for IAC at guilt/innocence, IAC at sentencing and IAC on appeal. In the guilt/innocence phase section of his MAR, Bowie alleged that, "Counsel erred when they did not object to the content of the sanitized statement of William Bowie in that it contained statements that could be utilized against defendant Nathan Bowie." (FIRST CLAIM (INEFFECTIVE ASSISTANCE OF COUNSEL: GUILT INNOCENCE PHASE) First Amended MAR, p. 14, ¶¶ 39) This is the extent of Bowie's MAR claim. He did not cite *Strickland*, *Bruton*, or any other case law. In the absence of a direct citation, he did not identify the elements that he had to prove to show that counsel were ineffective or that a *Bruton* violation had occurred. He did not identify any portion of William's statement that was improperly sanitized or put forth any argument as to why he believed it was improperly sanitized. In fact, he put forth no argument whatsoever to support his claim.

The MAR court found that William's statement was properly sanitized. As noted previously, admission of an unredacted, out-of-court statement of a non-testifying co-defendant that facially implicates a defendant violates that defendant's Sixth Amendment right to confront his accusers. *See Bruton*, 391 U.S. at 135-36. Furthermore, if a confession of a non-testifying co-defendant is redacted in such a way that it is clear that a particular defendant is implicated, the Sixth Amendment has been violated. *See United States v. Akinkoye*, 185 F.3d 192, 197 (4ᵗʰ Cir. 1999) (citing *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 1157, 140 L.Ed.2d 294 (1998)).

In this case, the prosecutor retyped William's confession, and replaced Petitioner's name with "someone" or used a neutral pronoun like "we." For example, William states that,

When I woke up, my sister asked me to go get something for the kids to eat. As I was getting ready to leave, someone came over. He asked me what happened the night before, and I told him about the incident with my sister and this guy Nelson. Then I walked up the hill to go to the store.

(Trial Tr. Vol. 5, p. 217) Later, he states that, "[w]e took Shelly over to my sister Joan's house." (Trial Tr. Vo. 5, p. 220) William also states that he heard shots being fired from behind him, but the redacted confession does not refer to anyone in connection with those shots. For example, William states that, "[m]e and Nelson started arguing. Then I just heard a shot come from behind me, and I saw Nelson fall.[10] This was the same guy I had the argument with the night before." (Trial Tr. Vol. 5, p. 219)

The United States Supreme Court has not addressed whether a redacted statement that refers to the existence of another person, who may be the defendant, through use of neutral pronouns or words such as "someone" or "another individual" is admissible. *See id.* at 198 (citing *Richardson*, 481 U.S. at 211 n. 5.) The circuit courts of appeal have split on whether the use of neutral pronouns and terms such as "someone" and "another individual" to replace the name of the defendant in a non-testifying co-defendant's statement violates the Confrontation Clause. *Compare*, *Spears v. Mullin*, 343 F.3d 1215, 1231-32 (10th Cir. 2003) (use of neutral pronoun "they" did not violate Confrontation Clause); *United States v. Logan*, 210 F.3d 820, 821-23 (8th Cir. 2000) (use of "another individual" did not violate Confrontation Clause); *Akinkoye*, 185 F.3d at 198 (use of "another individual" and "another person" did not violate Confrontation Clause); *with*, *United States v. Vejar-Urias*, 165 F.3d 337, 340 (5th Cir. 1999) (use of "someone" violated

---

[10]Because William's unredacted statement was not submitted as part of the record on federal habeas review, the Court does not know if this portion of William's statement was redacted or if this is what William actually said.

Confrontation Clause where defendant's name was mentioned during testimony regarding the co-defendant's statement).

Because the Supreme Court has not addressed this particular question, the MAR court's determination that the statement was properly sanitized is not contrary to any clearly established Federal law. *See Williams*, 529 U.S. at 405-06. Nor was it an unreasonable application of clearly established Federal law. William's statement did not implicate Bowie on its face. Bowie was implicated in the crime only through evidence introduced before and after William's statement was read to the jury. As such, any inference connecting Bowie to William's statement could be made only after considering the other evidence introduced at trial. In light of the foregoing and the split in the circuit courts on the issue of neutral pronouns and phrases, the MAR court's conclusion that William's statement was properly sanitized was not an unreasonable application of clearly established Federal law. *See id* at 411.

The MAR court properly concluded, under *Strickland v. Washington*, 466 U.S. at 687-88, that Bowie had not been denied effective assistance of counsel. Admission of William's statement was not contrary to or an unreasonable application of clearly established Federal law, and any objection on the grounds that the statement was not properly sanitized would have been overruled by the trial court. As such, counsel's failure to object to admission of William's statement did not prejudice Petitioner. *See e.g. United States v. Carter*, 355 F.3d 920, 924 (6th Cir.2004) (counsel was not ineffective for failing to file motion where there was no reasonable probability that motion would be granted); *see also A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion.").

The error in Bowie's case is that there was no limiting instruction given after the sanitized statement was admitted. *See Richardson*, 481 U.S. at 211. The MAR court recognized this omission as *trial court* error but concluded that it was harmless beyond a reasonable doubt because evidence of Bowie's guilt of first-degree murder was overwhelming. Petitioner does not challenge the MAR court's conclusion as it pertains to the guilt/innocence phase of the trial. Instead, he challenges the MAR court's failure to analyze harmlessness in the context of sentencing. Herein lies Petitioner's problem under the exhaustion requirement of § 2254.

The problem for Petitioner is that he did not raise a claim anywhere in his MAR, or subsequent five amendments to it, based upon counsel's failure to seek a limiting instruction or, for that matter, the trial court's failure to give a limiting instruction as required by *Richardson*. Apparently, it was the State that brought the error to the MAR court's attention and only in the context of guilt or innocence to first-degree murder. As such, that is what the MAR court addressed.

Petitioner bears the burden of showing that he has exhausted his claims. *See Mallory v. Smith*, 27 F.3d 991, 994 (4th Cir. 1994) (citations omitted). As noted previously, in order to fairly present a claim in state court, a petitioner must present both the operative facts and the controlling legal principals supporting a claim of a constitutional violation. *See Matthews v. Evatt*, 150 F.3d at 911. In this case, Bowie did neither. He failed to allege that no limiting instruction was given; he failed to cite *Bruton* or any of its progeny;[11] and in the absence of a direct citation to

---

[11]In the appellate phase section of his MAR, Bowie alleged that appellate counsel failed to assign as error or to raise on appeal, "The introduction of a "so-called" sanitized statement of William Bowie against Nathan Bowie in violation of the confrontation clause of the United States and North Carolina Constitution [sic]. Bruton v. U.S., 391 U.S. 123 (1968)." (THIRD CLAIM

Supreme Court authority, he failed to set forth the two elements necessary to avoid a Confrontation Clause problem (i.e. a properly sanitized statement *and* a limiting instruction). In fact, it is apparent that Petitioner did not realize that there was an error. Petitioner cannot now latch on to the fact that the MAR court recognized an error that he did not, and cry "foul" because the court did not address an issue that he did not raise.

In his Reply and Response to the State's Motion for Summary Judgment, Petitioner points to arguments scattered throughout the MAR that William's statement was used against him at sentencing as evidence that he fully exhausted the instant IAC claim. However, those prejudice arguments were made in support of claims alleging error on the part of the trial court[12] or ineffectiveness of counsel for failing to object to alleged misconduct on the part of the

---

(INEFFECTIVE ASSISTANCE OF COUNSEL: AT THE APPELLATE LEVEL) First Amended MAR, pp. 26-7, ¶ 83(c)) The Court notes two things: 1) the citation came in a claim alleging ineffective assistance of appellate counsel, and 2) the alleged error was failure to object to admission of the statement because it was not properly sanitized; there was no alleged error for failing to secure a limiting instruction.

[12]Bowie claimed that the trial court committed error in permitting joinder of defendants and denying his motion to sever because the court did not consider, among other things, the harm caused by William's statement "to defendant Nathan Wayne Bowie in either the guilt phase or the sentencing phase of trial." (FOURTH CLAIM: IMPROPER JOINDER OF THE CO-DEFENDANTS FOR TRIAL, First Amended MAR, pp. 28-29 ¶¶ 86-88; 90)

Bowie claimed that the trial court committed reversible error when it, "permitted the prosecutor(s) to argue facts from William Bowie's statement, against Bowie in closing argument in the sentencing and guilt phase of the trial . . . ." (SIXTH CLAIM: PROSECUTOR'S IMPROPER ARGUMENT BY UTILIZING FACTS FROM WILLIAM BOWIE'S STATEMENT AGAINST DEFENDANT NATHAN WAYNE BOWIE IN CLOSING ARGUMENT, First Amended MAR, pp. 31-32 ¶¶ 99-100) The Court presumes that Bowie's allegation was that the trial court erred in failing to intervene *ex mero motu* in the absence of an objection by counsel.

prosecutor.[13]  As the Fourth Circuit has explained,

> the exhaustion requirement demands that the petitioner 'do more than scatter some makeshift needles in the haystack of the state court record.  The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined.  Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.'

*Mallory*, 27 F.3d at 995 (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)).  At best, Petitioner has "scattered . . . needles" hinting at a theory,[14] but nowhere in the MAR does he "face-up and squarely" present a claim that counsel were ineffective under *Bruton/Richardson* for failing to secure a limiting instruction after the introduction of William Bowie's sanitized statement.  *See id*.

Petitioner also asserts that he exhausted this claim by raising it in his proposed final Order to the MAR court.[15]  However, the federal habeas exhaustion requirement "presuppose[s] that claims must be presented to a state court in accordance with state procedure."  *See Mallory*, 27 F.3d at 992.  Under North Carolina law, new claims must be raised by way of amendments to the MAR. *See* N.C. Gen. Stat. § 15A-1415(g).  Furthermore, after a hearing on the merits of an MAR has begun, "the defendant may file amendments only to conform the motion to evidence adduced

---

[13]Bowie claimed that counsel were ineffective for failing to object to the prosecutor arguing facts from William's statement in his closing argument at sentencing. (INEFFECTIVE ASSISTANCE OF COUNSEL: THE SENTENCING PHASE) First Amended MAR, p. 22, ¶ 64; p. 23 ¶ 71)

[14]The Court notes that the MAR court held that all of the above-mentioned claims were procedurally barred because they could have been raised on direct appeal. (July 18, 2002 Order Denying MAR, pp. 63-68; 80-81; 82-83).  Petitioner does not raise these claims in the instant Petition or challenge the MAR court's procedural rulings in any way.

[15]The MAR court allowed each side to submit a proposed Order adjudicating the MAR claims.

at the hearing, or to raise claims based on such evidence." *Id*. As such, new claims may not be raised in a post-MAR hearing brief of law or proposed Order, and there is no evidence in the record before this Court that Bowie filed an amendment to his MAR to raise an IAC claim for failure to secure a limiting instruction.

Because Petitioner did not allege error on the ground that no limiting instruction was given after William's statement was admitted, his claim that counsel were ineffective for failing to secure a limiting instruction, resulting in prejudice at sentencing, was not exhausted in the state courts. If he attempted to raise it now, it would be procedurally barred. *See* N.C. Gen. Stat. § 15A-1419(a). Petitioner does not argue cause and prejudice or fundamental miscarriage of justice to excuse his failure to fairly present this claim in all appropriate state courts. *See Fisher v. Angelone*, 163 F.3d at 844. Therefore, Petitioner's claim that counsel were ineffective for failing to secure a limiting instruction is procedurally defaulted.

This Court already has determined that the MAR court's conclusion that counsel were not ineffective for failing to object to admission of William's statement on the grounds that it was not properly sanitized was not an unreasonable application of *Strickland*. Therefore, Petitioner's claim that counsel were ineffective for failing to object to admission of William's statement is DENIED.

*CLAIM II: Ineffective Assistance of Appellate Counsel Surrounding Admission of Rochelle Bowie's Statement*

On the night of the murders, Rochelle Bowie made the following statement to two Hickory detectives:

On Thursday, 5/23/91, at approximately 11:00 or 12:00 o'clock midnight, Nelson Shuford and myself were arguing about my jewelry. Nelson told me that my jewelry was at his residence. I told him I wanted my jewelry by the end of the week. William Barfield Bowie, my brother, and I were walking down the street. I heard gunshots so I ran to my apartment. My brother got mad when the shooting took place. I talked to my brother and told him, "Don't worry about them, they are just punks." I saw my nephew, Nathan Wayne Bowie, with a .45 caliber handgun on Wednesday. I saw my brother William Barfield Bowie with a .25 caliber automatic on Thursday. The .25 caliber automatic was in my residence all day on Thrusday.

On 5/24/91, I was at Anna Marie MacIlwain's residence . . . . I heard a bunch of shots. After I heard the shots, Anna McIlwain and I came out and set on Anna's porch. There was approximately five minutes passed and my nephew Nathan Wayne Bowie and my brother William Barfield Bowie came down Ninth Avenue Southeast driving very fast. These subjects were driving my nephew's gray 1987 Nissan pickup truck.

My brother William Bowie got out of the truck and told me to get the kids so we could go. I got my children that were not in school and myself, William Bowie, Nathan Bowie, and my children went to my sister's house . . . .

Nathan Bowie and my brother let me out and said they were going to Philadelphia, Pennsylvania. One of the two stated while we were riding over to my sister's house that we got them. Either William or Nathan made the statement. The only three adults in the truck were myself, William Bowie, and Nathan Bowie.

On 5/24/91, both William and Nathan got together at my house. They both left my house around 9:00 o'clock a.m. I looked at the clock when my brother and nephew came back. It was about 10:15 a.m.

 . . .

(Trial Vol. 5, pp. 80-82) The statement was admitted under Rule 804 of the North Carolina Rules of Evidence governing admission of statements of unavailable witnesses. At trial, counsel objected to admission of the statement on the grounds that it violated the Confrontation Clause of the Sixth Amendment. The basis for the instant claim is appellate counsel's failure to assign as error or raise the Confrontation Clause issue on direct appeal.

In his MAR, Bowie claimed that appellate counsel were ineffective for failing to assign as error or raise on appeal that admission of Rochelle Bowie's statement violated the Sixth

Amendment. (THIRD CLAIM: INEFFECTIVE ASSISTANCE OF COUNSEL AT THE APPELLATE LEVEL, First Amended MAR, p. 28, ¶83 h)  The MAR court rejected this claim on the merits.  Because the MAR court correctly identified the governing legal standard as that set forth in *Strickland v. Washington,* 466 U.S. at 687-68, this Court's review is limited to the question of whether that court's application of *Strickland* was "objectively unreasonable." *See Williams*, *supra*, 529 U.S. at 409.

As noted previously, in order to prevail on an IAC claim, Petitioner must first show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the Defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88.  The Court must determine whether counsel's failure to raise the Confrontation Clause issue on appeal was deficient and, if so, whether appellate counsel's deficiency resulted in prejudice to Petitioner.  In order to make this determination, the Court must examine whether admission of the statement violated Petitioner's Confrontation Clause rights.  If it did, the Court must next determine whether Petitioner was prejudiced on appeal by appellate counsel's failure to raise the issue.  The threshold question is whether Rochelle Bowie's statement was erroneously admitted.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354 (2004).  In *Crawford*, the Court held that "testimonial" hearsay is inadmissable against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *See id*. at 68.  However, application of *Crawford* to Petitioner's claim is barred under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060,

103 L.Ed.2d 334 (1989) (new federal rules of constitutional criminal procedure may not be applied retroactively in collateral proceedings). In *Teague*, the United States Supreme Court held that, subject to two exceptions, a new rule of constitutional criminal procedure announced after a petitioner's conviction and sentence became final "may not be the predicate for federal habeas corpus relief unless the decision was dictated by precedent existing when the judgment in question became final." *See Stringer v. Black*, 503 U.S. 222, 227, 112 S.C.t. 1130, 1135 (1992) (citations omitted)). Petitioner's conviction became final in 1995, when the United States Supreme Court denied his Petition for Writ of Certiorari on direct review. *See Bowie v. North Carolina*, 516 U.S. 994, 116 S.Ct. 529 (1995).

The Fourth Circuit has not yet addressed the issue of retroactivity of *Crawford*, but of the circuits that have addressed it, the majority have held or suggested that it does not fall within one of the two exceptions to *Teague*, and, therefore, is not retroactive on collateral review. *See Espy v. Massac*, 443 F.3d 1362, 1367 (11th Cir. 2006)*; Lave v. Dretke*, 444 F.3d 333, 334-36 (5th Cir. 2006); *Murillo v. Frank*, 402 F.3d 786, 790-91 (7th Cir.2005); *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir.2005); *Mungo v. Duncan*, 393 F.3d 327, 336 (2d Cir.2004); *Brown v. Uphoff*, 381 F.3d 1219, 1226-27 (10th Cir.2004); *Evans v. Luebbers*, 371 F.3d 438, 444 (8th Cir. 2004), *cert denied*, 543 U.S. 1067, 125 S.Ct. 902 160 L.Ed.2d 800 (2005).[16] The Court agrees with the weight of authority cited above that *Crawford* did not announce a watershed rule of criminal procedure, *see Teague*, 489 U.S. at 311, 109 S.Ct. 1060 (plurality opinion), and that it, therefore,

_____

[16]The Supreme Court has granted certiorari in a Ninth Circuit case which holds that *Crawford* does apply retroactively. *See Bockting v. Bayer*, 399 F.3d 1010 (9th Cir. 2005), *cert. granted sub nom*, *Whorton v. Bockting*, 126 S.C. 2017, 164 L.Ed.2d 778 (U.S. May 15, 2006) (No. 05-595).

does not apply retroactively to cases on collateral review.

The admissibility of Rochelle Bowie's statement is governed by the "clearly established Federal law" prior to *Crawford -- Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) and its progeny. In *Ohio v. Roberts,* the Supreme Court held that in order for the admission of an out-of-court hearsay statement to meet the requirements of the Confrontation Clause, the declarant must be shown by the prosecution to be unavailable, and the statement itself must "bear[] adequate 'indicia of reliability.'" 448 U.S. at 65-66. Reliability can be inferred where the evidence falls within a firmly rooted exception to the hearsay rule. *Id.,* at 66. If the evidence does not fall within a firmly rooted exception to the hearsay rule, it must demonstrate "particularized guarantees of trustworthiness." *Id.* (footnote omitted).

In the instant Petition, Petitioner does not challenge or raise any sort of claim regarding the availability of Rochelle Bowie. As such, the only question before this Court is whether her statement "bears adequate 'indicia of reliability.'" *Id.* Rule 804(b)(5), under which the statement was admitted, is North Carolina's residual hearsay exception.[17] It is not a firmly rooted hearsay

_____

[17]Rule 804(b)(5) of the North Carolina Rules of Evidence is identical to Rule 803(24) which is the residual hearsay exception governing situations where the availability of the declarant is immaterial. They both read as follows:

> Other Exceptions.--A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to

exception for Confrontation Clause purposes. *See Idaho v. Wright*, 497 U.S. 805, 817, 110 S.Ct.

3139, 111 L.Ed.2d 638 (1990) (holding that Idaho's residual hearsay exception was not a firmly

rooted hearsay exception for Confrontation Clause purposes).  Therefore, in order to be

admissible for Confrontation Clause purposes, Rochelle Bowie's statement must show

"particularized guarantees of trustworthiness," based upon the totality of the circumstances that

"surround the making of the statement and that render the declarant particularly worthy of belief."

*Id*. at 819.

 The MAR court concluded that Rochelle's statement showed "particularized guarantees of

trustworthiness" because it was corroborated by other evidence introduced at trial.[18]  However,

the Supreme Court specifically rejected the use of evidence corroborating the truth of a hearsay

statement to support a finding that the statement bears "particularized guarantees of

trustworthiness."  *See id*. and *id*. at 822.  As such, the MAR court's reliance solely on

corroborating evidence at trial as evidence of the trustworthiness of Rochelle Bowie's statement

was an unreasonable application of *Idaho v. Wright*, 497 U.S. at 819 & 822.  *See Williams*, 529

U.S. at 407-08 (defining "unreasonable application").  However, the fact that the MAR court

applied clearly established Federal law unreasonably does not entitle Petitioner to relief on his

---

  prepare to meet the statement.
N. C. R. Evid. 803(24) & 804(b)(5).

 [18]In adjudicating Bowie's IAC on appeal claim, the MAR court relied upon findings of fact and conclusions of law made in its analysis of Bowie's MAR claim that *trial* counsel were ineffective for failing to object to admission of Rochelle Bowie's on the ground that "such statement lacked trustworthiness in violation of Rule 804(b)(5), the due process clause . . . and the confrontation clause . . . ." (FIRST CLAIM (INEFFECTIVE ASSISTANCE OF COUNSEL: GUILT INNOCENCE PHASE) First Amended MAR, p. 15, ¶42).  Therefore, this Court relies upon that section of the Order denying the MAR (MAR Order, pp. 34-38) for the state court's reasoning.

IAC claim.

Although the Confrontation Clause, as interpreted by the Supreme Court, requires a showing of "particularized guarantees of trustworthiness" prior to admission of an out-of-court statement under residual hearsay exceptions, the Supreme Court, prior to *Crawford*, declined to formulate a test for determining the trustworthiness of those statements. *See Hayes v. York*, 311 F.3d 321, 326 (4th Cir. 2002). Instead, the Supreme Court left it to the states to develop their own approaches, and North Carolina developed a formula by which to determine whether a statement offered for admission under the residual hearsay exception has "particularized guarantees of trustworthiness" in accordance with the demands of the Sixth Amendment. *See id*. In determining whether a statement has "particularized guarantees of trustworthiness," North Carolina courts must consider, among other factors, "(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination." *State v. Triplett*, 340 S.E.2d 736,742 (NC 1986) (citing *State v. Smith,* 337 S.E.2d 833 (NC 1985)). The Fourth Circuit has held that North Carolina's formula for evaluating whether hearsay evidence has "particularized guarantees of trustworthiness," sufficient to admit it under the residual hearsay exception satisfies Confrontation Clause demands. *See Hayes*, 311 F.3d at 327 (pre-*Crawford* case).

In this case, the trial court applied the correct North Carolina standard. On the issue of trustworthiness, the trial court found as matters of fact that Rochelle Bowie had personal knowledge of the underlying event about which her statement related; that she made the statement against both her own interest and that of close relatives; that there was nothing to indicate that she

ever recanted or changed or altered the testimony asserted in the statement; and that Rochelle Bowie was unavailable for meaningful cross-examination. Based upon the foregoing findings of fact, the trial court concluded as a matter of law that the statement possessed "particularized guarantees of trustworthiness," such that it was admissible under Rule 804(b)(5). (Trial Vol. 5, p. 78)

A finding of fact by a State court is presumed to be correct, and Petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has made virtually no effort to rebut the trial court's findings of fact. In fact, in the instant Petition, Petitioner puts forward no argument as to why admission of Rochelle's statement violated the Confrontation Clause. For example, Petitioner does not dispute that Rochelle Bowie had personal knowledge of the underlying events revealed in her statement. He has provided no evidence that she has since recanted, changed or altered the version of events offered in the statement. Nor has he presented any evidence to show that she was available to testify.

Petitioner seems to imply that a finding made by the trial court in its December 1992 Certificate for Attendance of Interstate Material Witness Order to bring Rochelle back to North Carolina[19] is evidence that the statement is untrustworthy. (Pet. MAR Exh. 5) The Court uses the word "imply" because Petitioner merely states the fact that the trial judge made a finding that " . . . in view of [Rochelle Bowie's] relationship to the defendants, and her possible involvement in these matters, it is highly unlikely that the witness would voluntarily return to North Carolina to

---

[19]At some point between the murders and the start of the trial, Rochelle moved back to Philadelphia, Pennsylvania.

testify at trial" without arguing how this finding is relevant to whether Rochelle's statement was trustworthy. The Court is not required to make Petitioner's argument for him. *See Small v. Endicott*, 998 F.2d 411, 418 (7th Cir. 1993). The Court notes, however, that the finding in the Material Witness Order was not based upon an assessment of the trustworthiness of Rochelle's statement or an analysis of the circumstances surrounding the making of the statement. Instead, it was based upon the State's theory of the case presented in an affidavit of the prosecutor prior to any evidence having been presented at trial. The Court notes further that, if anything, the necessity of the Material Witness Order speaks more to the trustworthiness of her statement than to the contrary. Her statement included information regarding her involvement in the incident on the night before. She also implicated her brother and nephew in a context that did not exculpate herself. In other words, while she may have down-played her reaction to the incident on the night before the murders, there is no indication that she was attempting to exculpate herself by implicating someone else. *See e.g. Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887 (1999) (admission of non-testifying accomplice's statement, obtained during custodial interrogation, that partially exculpated co-conspirator by implicating defendant did not have "particularized guarantees of trustworthiness") (plurality opinion). It is not likely that she would be unwilling to return to testify because she lied to investigators. On the other hand, it is likely that she would be unwilling to return because to do so would require her to testify against two close relatives.

In making its findings regarding "particularized guarantees of trustworthiness," the trial court used a formula recognized by the Fourth Circuit as meeting the requirements of the Confrontation Clause. The trial court's findings of fact are supported by the record, and Petitioner has presented no evidence to rebut the presumption that they are correct. The Court

notes additionally that Rochelle Bowie gave her statement to police in a private residence. She was not under arrest at the time; nor was she considered a suspect in the murders. Not only did Rochelle acknowledge her involvement in the incident on the night before the murders, but she implicated two close family members in a way that did not exculpate herself. Based upon the foregoing, the Court concludes that admission of her statement did not violate Petitioner's Confrontation Clause rights under pre-*Crawford* law.

The MAR court properly concluded, under *Strickland v. Washington*, 466 U.S. at 687-88, that appellate counsel was not ineffective for failing to raise a Confrontation Clause claim on appeal. Admission of Rochelle Bowie's statement did not violate the Confrontation Clause. Any claim on appeal that it did, would have been rejected. Therefore, Petitioner was not prejudiced by appellate counsel's failure to raise the constitutional issue on appeal. *See e.g. United States v. Carter*, *supra*, 355 F.3d at 924 (counsel was not ineffective for failing to file motion where there was no reasonable probability that motion would be granted); *see also A.M. v. Butler*, *supra*, 360 F.3d at 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion."). For the foregoing reasons, this claim is DENIED.

*CLAIM III: Ineffective Assistance of Counsel at Sentencing*

Petitioner claims that counsel were ineffective for failing to fully investigate and present readily available mitigating evidence to the sentencing jury. Specifically, Petitioner asserts that trial counsel had no sentencing strategy, failed to discover all reasonably available mitigating evidence, including evidence of alcoholism, sexual and physical abuse, failed to obtain the

assistance of a mental health expert who could have testified in support of three statutory mitigating factors, and failed to respond to overtures from numerous people who volunteered to testify on his behalf at sentencing.

At sentencing, counsel presented the testimony of six witnesses: Bowie's mother, Joan Hunt, social worker, Joanne Sigmon, two of Bowie's high school football coaches, his high school principal and his eighth grade teacher. Bowie's mother testified that she was sixteen when she had Bowie and that she was addicted to drugs and living in Philadelphia, Pennsylvania. She testified that when she could not leave the house, she would send Bowie, aged eight to nine, to a local street dealer with an envelope of money, and he would return with an envelope of drugs. She, Bowie and her other children moved from place to place at least 15 times between the time Bowie was born and the time he was placed in foster care at age twelve. She testified that she frequently would leave the home for days, sometimes weeks, leaving the children in the care of her husband, Bowie's stepfather. Bowie had little contact with his natural father because when Bowie was less than a year old, his father began serving a prison sentence for a gang-war murder. After that, the family moved to North Carolina. For their parts, Bowie's social worker, high school coaches, principal and eighth grade teacher testified that Bowie was universally well-liked; was an engaging person; had many friends; was eager to please; tried to do the right thing, and responded to criticism by trying to improve himself; was a talented, award-winning football player; was an average student in school, but tried hard to keep up with his schoolwork; that if he had any discipline problems, they were minor and that he was a follower rather than a leader; that he was not the type to misbehave at school or be disrespectful. They testified about a number of other positive attributes. Counsel did not present any testimony or evidence from Sipes Orchard

Home for Boys (hereinafter "Sipes"), a foster care facility for boys, where Bowie lived from ages thirteen to nineteen. Nor did counsel present any mental health mitigating evidence.

Petitioner raised an IAC claim in his MAR, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence contained in his Sipes records, county mental health records and Catawba County Department of Social Services (hereinafter "DSS") records. Petitioner argues that had counsel obtained these records, they would have discovered evidence of his severe alcoholism and mental illness. This information, Petitioner argues, would have justified funding for a mental health expert whose testimony would have secured submission of three statutory mitigating factors, § 15A-2000(f)(2), (6), and (7) and a number of non-statutory mitigating factors.[20] Furthermore, they would have discovered evidence of physical abuse in Petitioner's past. Finally, they would have been able to present evidence of Petitioner's good character from employees of Sipes.

To support his claim, Petitioner presented testimony at the MAR hearing from Dr. Nathan Strahl, a clinical and forensic psychiatrist, who testified that it was his opinion that at the time of the murders, Bowie suffered from intermittent explosive disorder, alcohol dependence, cannabis dependence, major depression and anti-social personality disorder. He also testified that in his opinion, Bowie was under the influence of alcohol and marijuana at the time of the murders and

---

[20]Statutory mitigating circumstances are set forth in § 15A-2000(f) of the North Carolina General Statutes. At issue in this claim are the following three statutory mitigating circumstances: "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," N.C. Gen. Stat. § 15A-2000(f)(2); "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," § 15A-2000(f)(6); and "[t]he age of the defendant at the time of the crime," § 15A-2000(f)(7).

that Bowie's maturity level at the time of the murders was five years behind his chronological age. He testified that in his view, Bowie was a "parentified child." Petitioner also called his sister, Mekia Bowie, and mother, Joan Bowie Hunt, who testified that Joan was a severe alcoholic, who frequently left the home, leaving Bowie in charge of all of the children, and who punched and beat Bowie when he was a little boy. Joan also testified that Bowie had a substance abuse problem. Petitioner called Joanne Sigmon who testified about Bowie's unstable home life and his life at Sipes. She testified that she became Bowie's social worker when his mother requested that DSS take custody of Bowie. She also testified that Bowie was insecure, suffered from low self-esteem and had trouble adjusting when people who were important to him left Sipes. She testified further that Bowie began showing signs of a substance abuse problem in high school. Finally, Petitioner called a number of current and former Sipes employees and volunteers who testified about Bowie's life at Sipes, as well as the quality of the care provided at Sipes. For their part, trial counsel testified that they had a sentencing strategy to present Bowie in a positive light – that he was well-liked and well-thought of, not a disciplinary problem, an excellent athlete who had had some bad things happen to him in the past. (MAR Tpp. 64; 168-69; 170; 171; 179; 180; 181; 182)

The MAR court addressed the claim on the merits and concluded that counsel's performance was not deficient because counsel had a reasonable strategy at sentencing to present Bowie in a positive light by showing he was a popular, well-liked and well-adjusted young man with a promising future. The court also concluded that Bowie was not prejudiced by counsel's failure to discover and present the evidence introduced during the MAR evidentiary hearing. Because the MAR court correctly identified the governing legal standard as that set forth in *Strickland v. Washington*, 466 U.S. at 687-88, this Court's review is limited to the question of

36

whether that court's application of the *Strickland* standard was "objectively unreasonable." *See Williams v. Taylor*, *supra*, 529 U.S. at 409, 120 S.Ct. 1495.

In its adjudication of this claim, the MAR court made a number of findings of fact, one of which was that trial counsel made a strategic choice at sentencing to present the defendant in the best possible light to the jury by showing that Bowie was a popular, well-liked, and well-adjusted young man, whose childhood years were filled with hardship not of his own making, and who, on the morning of the murders, made a terrible mistake. A finding of fact by a State court is presumed to be correct, and Petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Petitioner challenges the MAR court's finding that counsel had a sentencing strategy. Petitioner argues that the MAR court's heavy reliance on attorney Portwood's testimony regarding a strategy was unreasonable because Portwood's testimony lacked credibility. Specifically, Petitioner asserts that Portwood's credibility is in doubt because he had no notes of his "all-American boy" strategy;[21] he did no research on sentencing issues or penalty phase law; he had no notes of interviews with penalty phase witnesses; he did not examine any penalty phase witnesses; and his decades-long, severe alcohol problem made his memory of past events unreliable.

For the most part, these facts in no way undermine the state court's finding that defense counsel had a strategy to present Bowie as a well-liked, popular, scholar-athlete. Both Portwood

---

[21]Portwood testified that he wanted to present Bowie to the jury as an "all-American boy." The MAR court picked up on this phrase, and this Court periodically uses the same term to refer to part of the defense strategy.

and Killian testified consistently and repeatedly that Killian was responsible for the sentencing phase of the trial. Therefore, the fact that Portwood had no notes of an "all-American boy" strategy, conducted no interviews of penalty phase witnesses, did no research on sentencing issues or penalty phase law and did not examine any witnesses during the penalty phase of the trial is not probative of whether the defense had a strategy at sentencing. While Portwood's acknowledged alcoholism and its possible effect on his memory causes this Court concern, the state court's finding that there was a sentencing strategy rested as heavily on Killian's testimony as it did on Portwood's. Although Killian testified that he did not recall ever discussing a sentencing strategy with Portwood, he also testified that his mitigation strategy was to present Bowie in a positive light – that he was well-liked and well-thought of, not a disciplinary problem, an excellent athlete who had had some bad things happen to him in the past. (MAR Tpp. 64; 168-69; 170; 171; 179; 180; 181; 182) He, therefore, called Petitioner's mother, social worker, high school principal, two high school football coaches and his eighth grade teacher to testify regarding his positive attributes, as well as his difficult childhood. Based upon the foregoing, Bowie has failed to provide clear and convincing evidence that the MAR court's finding of fact that there was a sentencing strategy was erroneous.

However, the fact that counsel made a strategic decision to present an "all-American boy" mitigation defense does not end this Court's inquiry. Under *Strickland*, a high level of deference is accorded to the judgments of counsel when those judgments are based on a "thorough investigation of the law and the facts." *Id*. at 690. When the thoroughness of counsel's investigation is challenged, as it is here, a reviewing court must assess whether counsel's decision not to investigate or to abandon further investigation was itself reasonable. *See Wiggins*, 539 US

at 523. As the Court in *Strickland* explained:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91. As such, the deference owed to counsel's strategic decisions is in direct proportion to the reasonableness of the investigation by which they arrived at those strategic decisions. *See id.* In other words, "a reviewing court must consider the reasonableness of the investigation said to support [the mitigation] strategy." *Wiggins*, 539 US at 527 (citing *Strickland*, 466 U.S. at 691). Therefore, the issue before this Court is not whether counsel should have adopted a different mitigation strategy, but whether the investigation supporting counsel's decision to adopt one mitigation strategy over another was itself reasonable. *See id.* at 523 (citations omitted).

Starkly absent from the MAR court's *Strickland* analysis is any discussion of the quality of the investigation counsel undertook before arriving at their sentencing strategy. Instead, the MAR court's conclusion that counsel's strategy was reasonable relies heavily upon Portwood's testimony regarding the nature of Catawba County juries. The MAR court found that defense counsel chose the "all-American boy" strategy because conservative Catawba County juries tended to be more receptive to mitigation defenses focused on the good character of the defendant rather than on mental health factors. The MAR court concluded further that counsel's

strategy was grounded in emphasizing the defendant's positive qualities and not emphasizing qualities which would have supported mental health mitigating factors.

The MAR court's findings and conclusions are erroneous and unreasonable for a number of reasons. First, they assume that counsel conducted a reasonable mitigation investigation to determine what strategies were available to them. Second, they imply that counsel actually evaluated the merits of different strategies and chose that which they thought was most likely to succeed. However, the record shows the opposite to be true.

Portwood's MAR testimony makes clear that in deciding upon a strategy, he did not evaluate his strategy options. Portwood testified that he arrived at a sentencing strategy after his first meeting with Bowie and after having conducted no investigation into Bowie's background. Therefore, he could not have known if a mental capacity strategy was even available to him. Furthermore, Portwood made a conscious decision not to investigate whether mental health factors might exist because he did not want to know anything "bad" about his client. According to Portwood, he wanted the jury to see Bowie as he saw him in that first interview: a nice guy, popular, well-liked, well-known, scholar athlete. (MAR Tp. 1103) When questioned about why he did not respond to overtures from faculty and volunteers from Sipes, Portwood explained that he had learned through a chance encounter at a dry cleaner's that Bowie had gotten into numerous "scrapes" at Sipes. At that point, Portwood testified, he made a conscious decision not to investigate Bowie's time at Sipes or to talk to anyone associated with Sipes because he did not want to know anything bad about Bowie. According to Portwood, he was a "bad liar," and if he knew anything negative about his client he would not be able to argue convincingly to the jury that Bowie was a fine, upstanding young man. (MAR Tpp. 1111-12; 1113; 1114) He also

testified that he was afraid that if he investigated Bowie's time at Sipes, the DA might find out about it and send an investigator to look into Bowie's record at Sipes. Finally, as Portwood acknowledged, despite Catawba County citizens alleged aversion to mitigation defenses based upon mental health factors, he had successfully obtained a life sentence for a capital defendant, Richard Ramseur, using a mitigation strategy based upon mental health factors. (MAR Tpp. 1263-64) As such, his testimony establishes that he was willing to put forward a mitigating defense based upon mental health factors, if he believed it was good defense.

Suffice it to say, an attorney's decision not to conduct a mitigation investigation because he might find out something that ruins his rosy image of his client does not constitute a "reasonable decision" under the prevailing standards of practice at the time of Petitioner's trial.[22] The American Bar Association Guidelines (hereinafter "ABA Guidelines") provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 US at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in the original). Any hints that Bowie might not be the "all-American boy" that Portwood thought he was should have triggered the opposite reaction in Portwood than it apparently did. He should have investigated, or instructed Killian to investigate, all available avenues to determine whether the "all-American boy" strategy was the best, or even a valid,

---

[22]As an aside, the Court wonders what Portwood possibly thought he might discover at Sipes that could be worse than shooting two men to death. The Court also notes that Portwood knew Bowie had a conviction for "Assault on a Female," a crime of violence.

defense for Bowie. As equally unreasonable as Portwood's "head-in-the-sand" investigation philosophy was his other purported rationale for not investigating Petitioner's background – that the DA might find out about it. Apparently, Portwood decided he would protect Bowie by not responding to overtures from people offering to testify on Bowie's behalf.[23] Again, such an approach is not reasonable under the professional norms at the time. *See id*. Any reasonably competent attorney would have realized that pursuing leads about Bowie's background was necessary not only to make an informed choice among possible mitigation strategies, but also to discover what aggravating evidence might be out there for use by the DA so that counsel could be prepared to neutralize, explain or mitigate it if it came out at sentencing.

Bowie, of course, had two attorneys, and Portwood explained that after he arrived at his strategy, he made Killian responsible for all aspects of the sentencing phase of the trial. Killian began his sentencing investigation in mid-December 1992, a little less than a month before the start of Bowie's trial. (MAR Tpp. 69-70) Although his fee application indicates that he spent 100 hours outside of court preparing for trial (MAR Tp. 159), his time sheet reflects that most of that time was spent preparing for the guilt/innocence phase. For example, interviews with sentencing witnesses account for less than three hours, and the time sheet contains no reference to document review connected with sentencing. (Pet.'s MAR Exh. 4) Although Killian testified that he had a sentencing strategy, he did not explain how he arrived at that strategy. He had no recollection of

---

[23]Mitzi Gellman, Mike Ledford and Sandra Deal, all of whom had ties to Sipes, testified at the MAR hearing that they either called Portwood's office or spoke to him face-to-face and offered to testify on Bowie's behalf at sentencing. All testified that Portwood failed to contact them regarding their offers. Mike Ledford testified that Killian was present when he made his offer to testify but that Killian also failed to follow up on his offer.

discussing a sentencing strategy with Portwood.

Killian's overall investigation was extremely circumscribed; he interviewed five people – Bowie's mother, his eighth grade teacher, his high school principal and his two high school football coaches. Joan Bowie Hunt, Bowie's mother, testified that Killian told her the questions he would ask her at sentencing but did not seek any input from her about what she could tell a jury about Bowie. Killian's pre-trial interview notes indicate that the two football coaches told him that Bowie had poor coping skills, was a loner, had a loose fuse, was a troubled kid, that he lacked self-confidence but accepted criticism well, and that he was a model resident at Sipes. They also recommended that Killian get Bowie's records from Sipes and talk to Sam Steele, a Sipes counselor who knew Bowie well. (MAR Tpp. 96-99) Frances Whitener, Bowie's eighth grade teacher, told Killian that Bowie was well-liked by everyone, had low to average academic abilities; handled Sipe's rules well but needed a strong male role model in his life; that he longed for a role model and was easily led by others. Killian did not interview Joanne Sigmon, even though she had been Bowie's DSS worker for the five and half years that he was in DSS custody. Sigmon testified at the MAR hearing that the only contact that she had with Killian prior to trial was a brief face-to-face encounter at the courthouse. At that time, he informed her that he might need to call her to testify for Bowie. He also told her that he might ask her to talk to Bowie about accepting the government's plea offer. She testified that the next contact she had with Killian was when she testified at sentencing and that she did not know what Killian was going to ask her until he put her on the stand. Killian confirmed that prior to trial, he did not ask Sigmon what she knew about Bowie. (MAR Tp. 65) Nor did he review her DSS records documenting her involvement with Bowie and his family. (MAR Tp. 67) In fact, Killian did not collect or

43

review *any* of Bowie's pre-incarceration records, including his DSS, county mental health, Sipes, education, family court and employment records.[24] Killian also did not seek the assistance of a mental health professional to determine if there were any mental health mitigating factors that he could present at sentencing. Nor did he speak to anyone connected to Sipes. As a result, Killian was totally unaware that, among other things, Bowie had a serious substance abuse problem at the time of the murders.

Unlike Portwood, Killian testified that he had no strategic reason for not conducting a full investigation into Bowie's background. (MAR Tp. 90) In fact, he intended to investigate Bowie's background more fully, but did not get around to it. For example, on New Year's Eve 1992, Killian traveled to Polk Youth Correctional Center and got Bowie to sign releases so that he could get copies of Bowie's Sipes, Catawba County DSS and education records, but Killian never sent them to the respective agencies. (MAR Tp. 67; 72; 73) On his "to do" list, Killian listed "Interview Sipes Orchard Home personnel" regarding sentencing, but he failed to accomplish that task, even after sentencing witnesses recommended people he should talk to at Sipes.[25] (Pet. MAR Exh. 5; MAR Tpp. 69; 97-98) There is no credible argument that Killian did not follow

---

[24]The only records Killian collected were Bowie's mental health and substance abuse records kept by the Catawba County jail during the time that Bowie was there awaiting trial. (MAR Tp. 105; 108) Even then, Killian did not investigate indications in that report that Bowie had a substance abuse problem.

[25]The MAR court's finding of fact that "[c]ounsel did not call witnesses other than those presented at trial because the defense's point had been made and counsel believed that "overkill" undermined the effectiveness of the evidence presented," is clearly erroneous. § 2254(e)(2). At sentencing, Killian called all of the witnesses that he interviewed regarding sentencing. Portwood interviewed no witnesses with regard to sentencing. These two facts establish that counsel called all of their witnesses. Because they had no other witnesses to call, counsel could not have made a strategic decision not to call other witnesses in order to avoid "overkill."

through with those tasks because he did not believe that they would yield anything valuable.  In fact, he offered Bowie's five years at Sipes as a non-statutory mitigating circumstance, so he clearly believed it was mitigating.  Had he carried through with his plan to interview Sipes personnel, he might have discovered several people (Claudia and Jack Norman, Mike Ledford, Sandra Deal) who knew Bowie through Sipes but who knew nothing of his misbehavior there or at school and who, therefore, could only have testified positively about him.  However, Killian did not offer any evidence from Bowie's years at Sipes, opening the door for the prosecutor to ask the jury to draw negative conclusions from the fact that noone from Sipes testified on Bowie's behalf.

Killian also did not seek the assistance of a mental health professional to determine if there were any mental health mitigating factors that he could present at sentencing.[26]  Although seeking the assistance of a mental health professional may not be necessary in every capital case, any reasonably competent attorney would realize that someone who had spent his first twelve years with a drug-addicted mother, who had been shuttled from one home to another multiple times over those twelve years, who had spent almost all of his teenage years in DSS custody and who had lived for five plus years in a foster care facility might have some psychological issues – mitigating or aggravating – that warranted investigation.  *See* ABA Guidelines for the

---

[26]While it is true that Portwood sought a competency exam for Bowie, he did not do so for the purpose of mitigation.  The reason for the competency exam was Bowie's refusal to accept a plea to second degree murder for both killings.  Portwood was concerned that Bowie did not understand the seriousness of the charges against him.  Although Killian knew about the exam, he was not given a copy of the examination report, nor did he seek one.  Furthermore, the purpose of the competency exam was to determine whether Bowie was competent to stand trial; it was not for the purpose of determining if any mitigating factors existed.

Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(d)(7)(D) (counsel should secure assistance of experts where it is necessary or appropriate for presentation of mitigation). Any reasonably competent attorney would realize that he at least should review his client's existing mental health records to see if they indicated that an expert should become involved in the mitigation case. *See id*. at 11.4.1(d)(2)(C) (counsel should collect "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays)"). For example, after reviewing Bowie's records, Dr. Strahl formed the opinion that Bowie's maturity level at the time of the murders was five years behind his chronological age, something that he could have testified to at sentencing to support submission of the (f)(7) mitigating factor. As it was, Killian was unsuccessful in securing submission of the (f)(7) mitigating factor because he failed to offer any supporting evidence.[27]

The MAR court's application of legal principals governing the deficiency prong of *Strickland* was objectively unreasonable. Although the MAR court found that counsel had a sentencing strategy, the court did not assess whether that strategy was based upon a reasonable investigation or whether counsel made a reasonable professional judgment to conduct a limited investigation. In light of Portwood's admission that he arrived at a sentencing strategy prior to having conducted any investigation into Bowie's background and his subsequent decision not to conduct any investigation that might reveal something negative about Bowie, a fully informed decision with respect to a sentencing strategy was impossible. As for Killian, evidence presented at the MAR evidentiary hearing shows that his failure to conduct a more thorough investigation of

---

[27]The Court notes that Killian failed to conduct any research to determine what type of evidence was necessary to secure submission of the this factor other than chronological age.

Bowie's background for mitigating evidence was not based upon reasonable professional judgment but was the result of poor planning and poor execution. As such, a fully informed decision with respect to sentencing strategy was impossible. For the foregoing reasons, the MAR court's reliance on the fact that counsel had a sentencing strategy to conclude that counsel were not deficient in failing to conduct a more thorough investigation was an objectively unreasonable application of *Strickland*. 466 U.S. at 690-91.

The fact that the MAR court unreasonably applied *Strickland* in its analysis of whether counsel were deficient, does not entitle Petitioner to relief. The MAR court also conducted a prejudice analysis under *Strickland* and concluded that Petitioner was not prejudiced by counsel's failure to discover and present additional evidence to the jury at sentencing.

Petitioner makes two main assertions regarding prejudice. The first is that if counsel had conducted a reasonable investigation, they could have presented evidence that would have warranted submission of three additional statutory mitigating factors. The second is that when the MAR court conducted its prejudice analysis, it failed to weigh all of the available mitigating evidence against the aggravating evidence as required by *Wiggins v. Smith.* 539 U.S. 510, 534, 123 S.Ct. 2527, 2542 (2003).

Petitioner asserts that had counsel conducted a reasonable investigation, they would have discovered sufficient evidence to warrant submission of the following three mitigating factors:

> The capital felony was committed while the defendant was under the influence of mental or emotional disturbance. N.C. Gen. Stat. § 15A-2000(f)(2);
> The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. § 15A-2000(f)(6); and

The age of the defendant at the time of the crime." § 15A-2000(f)(7).

(hereinafter "(f)(2), (f)(6) and (f)(7)").  The MAR court made a number of findings of fact with regard to these mitigating circumstances and concluded as a matter of law that Petitioner would not have been entitled to submission of any of the three even if trial counsel had discovered all of the evidence Bowie presented at the MAR.

The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761 (1998) (citations omitted). However, "the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Id.* (citations omitted).  To the extent that statutory mitigating circumstances are used "to shape and structure the jury's consideration of mitigation" in a state capital sentencing scheme, they are creatures of state law. *See Buchanan*, 522 U.S. at 275-76 (no constitutional requirement that trial court issue instructions on particular mitigating factors); *see also Hill v. Mitchell*, 400 F.3d 308, 333 (6th Cir. 2005) ("The right to have certain statutory mitigating factors considered (or aggravating ones ignored) is a creature of state statute, not the federal Constitution.") (citations omitted).  A state court's decision on a question of state law is binding in federal court.  *See Roach v. Angelone*, 176 F.3d 210, 217 (4th Cir. 1999); *Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998).  Thus, the MAR court's determination that Petitioner would not have been entitled to submission of the (f)(2), (f)(6) and (f)(7) mitigating circumstance is controlling.  *See Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (A federal habeas court's review is "limited to

deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). The question of whether discovery and presentation of additional mitigating evidence at sentencing would have warranted submission of the (f)(2), (f)(6) and (f)(7) mitigating circumstances is not subject to review by this Court. *See id*.

The Court now turns to the issue of whether Petitioner was prejudiced by trial counsel's failure to discover and present additional evidence in support of a sentence less than death separate and apart from whether that evidence would have warranted submission of additional statutory mitigating circumstances. The United States Supreme Court has held that the only way to determine whether a defendant was prejudiced by his counsel's failure to offer certain mitigating evidence at sentencing is to re-weigh the aggravating evidence against *all* of the mitigating evidence adduced both at trial and in the post-conviction proceedings. *See Wiggins*, 539 U.S. at 534, 123 S.Ct. at 2542.

Petitioner's mitigating evidence tended to show that he was born to a teenaged mother who was emotionally and financially unable to provide a stable environment for him. His family lived in an impoverished neighborhood in Philadelphia. His mother moved Bowie and his siblings numerous time. Sometimes he lived with his mother; sometimes he lived with his grandmother. During one of the periods that he lived with his grandmother, he was sexually abused by his grandmother's boyfriend. His natural father was largely absent from his life because he was serving a prison sentence for his involvement in a murder. Bowie's mother was an alcoholic and a drug addict, who frequently would send Bowie to a local drug dealer to purchase drugs for her. Because of her addictions, Bowie's mother would disappear for long periods of time, sometimes days, leaving Bowie in charge of the younger children. Bowie's mother frequently punched,

49

slapped, and "slugged" Bowie and would put him in a room by himself when he misbehaved.

When Bowie was around 10 years old, the family moved to North Carolina which is where John Stanford, Bowie's step-father lived. Bowie's mother frequently left Bowie with John Stanford and went back to Philadelphia for days, sometimes weeks. Often John also was gone from the home, leaving Bowie in charge of the younger children. Bowie began getting in trouble with the law after moving to North Carolina. When he was twelve, Catawba County DSS became involved in his life at the request of a juvenile court counselor. Bowie's mother subsequently sought DSS custody for Bowie because she no longer was able to control him. Because there was no stable adult supervision at home, Bowie ran the streets. Joanne Sigmon became Bowie's social worker, and they developed a close relationship. Joanne was able to secure a place for Bowie at Sipes. Bowie lived there until he was nineteen.

Petitioner's evidence tended to show that Sipes provided a stable environment for him. He was well-liked by the staff and other residents. He often was considered to be the "pet" or favorite of his house parents. He became particularly close to house parent Lydia Anglin and her sons. Anglin took him to Oklahoma with her family for a family reunion one summer. Evidence also showed that Bowie largely stayed out of trouble with the law while he was at Sipes. His troubles tended to reemerge when he went home for long visits because the environment there had not improved. His mother still abused substances and frequently was absent from the home. At some point, his mother and step-father separated permanently, adding another element of instability in his life.

Evidence from Sipes personnel and from Joanne Sigmon tended to show that Bowie had a

difficult time adjusting when people he was close to disappeared from his life. For example, when his juvenile court counselor died, Bowie had a difficult time coping. The same is true when Brian Phelps, the director at Sipes, left. Bowie did receive some mental health counseling during this time, and expert testimony tended to show that his inability to adequately deal with the loss of these people in his life was evidence that he was suffering from an adjustment disorder. Evidence also tended to show that Bowie had low-self esteem, lacked confidence and tended to follow the lead of whatever group he was with at the time. Almost all of the witnesses who testified for him at sentencing described him as a follower, not a leader.

Evidence from Sipes personnel, Joanne Sigmon and school personnel tended to show that Bowie was a below average to average student whose academic record was spotty. When motivated, he would complete his work and work hard at his studies. At other times he neglected his school work. However, after failing the eighth grade, Bowie passed each year either on time or after making up classes during summer school. He successfully graduated from highschool. Additionally, he played football and was very successful at it. He won several awards and was praised by his coaches for his hard work and willingness to take constructive criticism. Evidence presented tended to show that Bowie was polite, nice, friendly and respectful and that his teachers, coaches and peers liked him.

Evidence from Sipes personnel, Joanne Sigmon, and Guardian ad Litem personnel tended to show that at the time Bowie lived at Sipes, it had a good reputation in the community. However, evidence was presented that there were a number of substantiated allegations of abuse of residents including the use of racial epithets by one of the house parents towards several of the residents, an assault by the same house parent of one of the residents, sexual abuse of one or more

residents by one or more other residents due to inadequate supervision by staff, and, most seriously, sexual abuse of one or more residents by a house parent. This last resulted in criminal convictions of the house parent. Evidence tended to show that Bowie was aware of these instances of abuse, and as a result of the last, kept a big stick by his bed. Evidence also tended to show that in comparison with current times, Sipes staff did not have adequate education or training for the types of duties they performed and that Sipes did not offer comparable mental health counseling, tutoring, educational or vocational support, or other program support for the residents. Evidence also tended to show that the services offered at Sipes were consistent with services offered at similar facilities at the time.

Evidence offered by Sipes personnel, Joanne Sigmon, Joan Hunt, and mental health experts tended to show that Petitioner began to develop a serious substance abuse problem in high school. Evidence tended to show that Petitioner would drink until he got sick and frequently would black out while drinking. Petitioner refused to acknowledge that he had a problem with alcohol and resisted all efforts to get him to seek help for his problem. Eventually, the director at Sipes told Petitioner that he must agree to obey Sipes rules and get counseling for his alcohol problem or leave Sipes. Petitioner chose to leave Sipes. After leaving Sipes, he got his own apartment and started attending classes at Catawba Valley Community College on a scholarship he obtained through Sipes. He did well in school his first semester and continued to faithfully make payments on the truck that Joanne Sigmon had helped him buy. However, he dropped out of school after the first semester and moved to Philadelphia.

Petitioner presented evidence at the MAR that the night before the murders, he was drinking heavily and smoking marijuana with friends from high school. Evidence presented

showed that he left those friends around 1:00-1:30 a.m. the morning of the shootings.

Also presented at the MAR hearing was a wealth of aggravating evidence, including evidence of rebellious and maladaptive behavior, much of which negated the mitigating evidence presented. For example, although Bowie frequently was left in charge of his younger siblings when his mother and step-father would disappear, evidence shows that rather than take on that responsibility, Bowie would leave also. Evidence shows that it was Mekia, his younger sister, who took on the parental role in the family and that Bowie would stay away from home for as long as, and sometimes longer, than their mother. It was during this time that Bowie began to get into trouble with the law.

Although evidence showed that there were substantiated allegations of abuse at Sipes while Bowie was there, there is no evidence that Bowie himself suffered abuse or that he was directly affected by the instances of abuse that occurred. Furthermore, although evidence showed that Sipes was not an ideal place to grow up, everyone who testified for Bowie was of the opinion that he benefitted from being at Sipes. The witnesses were in accord that Bowie was better off there than at home. In fact, Sipes provided him with a relatively stable, safe environment with responsible adult supervision. Because he was so well-liked and a favorite among the staff, he was given privileges that other children were not, and Sipes staff often overlooked his frequent rule violations. Bowie, in fact, broke the rules at Sipes regularly. He violated the alcohol policy at least nine times; frequently came home smelling like alcohol; smuggled alcohol, weapons, girls and pornography into his room; frequently snuck off campus at night; took a second-shift job so that he would not have to abide by the home's curfew; had a history of not telling the truth; was suspended from school on a number of occasions for fighting and bringing alcohol and marijuana

53

on campus; and lured a 12-year-old girl into the Sipes van during a trip to the mall and had her undressed before they were caught. A psychological report on Bowie during his time at Sipes indicated that he was aware that what he was doing was in violation of the rules at Sipes and at school, but that he was reluctant to accept responsibility for it and displayed little remorse or regret for his behavior.

Petitioner argues that his mitigating evidence shows that at the time of the murders he was operating under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct was impaired. As evidence, Petitioner points to his substance abuse problems and what he terms his "mental illness." All of the mental health experts who testified at the MAR hearing agreed that at the time of the murders Bowie abused both alcohol and marijuana. However, there was no evidence that Bowie was under the influence of either at the time of the murders. Although two friends testified that Bowie drank heavily the night before the murders, he left them at around 1:30 a.m. The murders occurred around 10:00 a.m. the same morning. There was no evidence that Bowie drank or smoked marijuana between those two times. In fact, a witness at trial testified that sometime after 2:00 a.m. Bowie and William returned to Rochelle Bowie's house and went to sleep until sometime before 8:00 a.m.

Furthermore, there was no evidence that Bowie suffered from any mental illness or disorder such that at the time of the murders he was operating under a mental or emotional disturbance or that his capacity to appreciate the criminality of his conduct was impaired. On the contrary, all of the mental health experts diagnosed Bowie with anti-social personality disorder (hereinafter sometimes "ASPD"), and all agreed that the disorder was present at the time of the murders. Anti-social personality disorder, according to expert testimony, is a behavioral disorder

and not a mental or emotional disorder.  The disorder is characterized by a pervasive disregard for and violation of the rights of others, irresponsibility, a preference for an unstable lifestyle and disregard for lawful behavior.  Furthermore, people diagnosed with ASPD, in the absence of mental retardation or schizophrenia, are capable of understanding right from wrong, forming intent, and planning and carrying out crimes.  There was no expert testimony that Bowie was mentally retarded or suffered from schizophrenia.  Lastly, the events of the crimes indicate an absence of emotional or mental disturbance.  Bowie became involved in the situation with his relatives roughly eight hours before the murders.  He brought his gun to his aunt's apartment.  He directed his uncle where to locate one of the victims, and in fact, twice attempted to locate one of the victims himself.  He and his uncle isolated the two victims from a crowd of six and killed only those two victims.  No one else was hurt.  All of the above indicate deliberateness and planning and an absence of impairment.  As such, there was no evidence that at the time of the murders, Bowie suffered from anything other than a maladaptive behavioral disorder that did not impair his ability to appreciate the consequences of his actions.

The jury found the following circumstances from Bowie's life to be mitigating: his parents were not married and his father was significantly absent from his life; his childhood was spent in a housing project in Philadelphia, and he grew up in an impoverished and urban environment; his family was unstable; his mother suffered from drug addition, and he had to go get drugs for her; he spent several weeks in a boys home in Philadelphia while his mother received substance abuse treatment; he was sexually abused as a child by his grandmother's boyfriend; his mother was significantly absent from his life during his junior and high school years; he was an excellent high school football player and was awarded WBTV and WNNC Player of the Week Awards; he was

cooperative with his coaches and accepted criticism; he was well mannered and got along well with his fellow students; he graduated from high school; he did well in a structured environment; and he voluntarily turned himself in to law enforcement authorities. This Court is not convinced that had the jury heard additional details about his unstable background, including evidence of physical abuse by his mother, and about his life at Sipes, including the development of his substance abuse problem at a young age and his inability to cope with events that disrupted the stability in his life there, that it would have been enough to outweigh the aggravating evidence present in this case. Not only did Petitioner shoot and kill two unarmed, unsuspecting men[28] without provocation, his teenaged years were marked by maladaptive, self-destructive and rebellious behavior at the very place that provided the only stable, safe environment that he had ever experienced. Nor would Bowie's case have been helped by his ASPD diagnosis, which was characterized by his pervasive pattern of disregard for and violation of others, deceit and repeated lying for his own gain, and his maladaptive and destructive behavior at home, at Sipes and at school.

Based upon the foregoing, the Court concludes that the mitigating evidence offered at sentencing and at post-conviction is insufficient to outweigh the aggravating evidence presented during trial and at post-conviction. *See Wiggins*, 539 U.S. at 534, 123 S.Ct. at 2542. Petitioner

---

[28]Based on the jury's positive response to the special question at sentencing,

Do you unanimously find from the evidence, beyond a reasonable doubt, that the defendant himself: Killed or attempted to kill the victim, [Wilson/Shuford]; or Intended to kill the victim, [Wilson/Shuford].

(Record on Appeal, pp. 55 & 60)

has failed to show that there is a reasonable probability that but for trial counsel's failure to conduct an adequate mitigation investigation, the outcome of his sentencing proceeding would have been different. *Strickland*, 466 U.S. at 694. The MAR court's conclusion that trial counsel were not ineffective at sentencing was not an unreasonable application of *Strickland v. Washington*. *See* § 2254(d)(1). This claim is DENIED.

*CLAIM IV: Use of a Short-form Murder Indictment*

Petitioner's claim consists entirely of the following statement:

The short-form murder indictment contained no aggravating factors and supported at most the elements of second-degree murder in violation of [sic] due process clause of the Fourteenth Amendment to the Constitution of the United States.

(PWHC, p. 21 ¶42)

To the extent that this bare statement with no citation to case law and with no supporting argument even constitutes an adequately raised claim, this Court will devote as much time analyzing it as Petitioner did briefing it. "[A] short-form indictment that alleges the elements of common law murder is sufficient to satisfy the demands" of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *Hartman v. Lee*, 283 F.3d 190, 198-99 (4th Cir. 2002) (relying on *Davis v. Territory of Utah*, 151 U.S. 262, 14 S.Ct. 328 38 L.Ed. 153 (1894) and *Bergemann v. Backer*, 157 U.S. 655, 15 S.Ct. 727, 39 L.Ed. 845 (1895)). As such, the MAR court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

*CLAIM V: The State's Control over the Calendar*

Petitioner's claim consists entirely of the following statement:

The prosecutor had control over calendaring the case for trial and thus allowed him to select the trial judge and the time for the trial when Petitioner's counsel were not prepared to go forward in violation of the Fourteenth Amendment to the Constitution of the United States.

(PWHC, p. 21 ¶ 43) The foregoing is insufficient to state a claim for relief under federal habeas review. Rule 2(c)(2) of the Rules Governing § 2254 Cases requires a petitioner to "state the facts supporting each ground" for relief. As is clear from the conclusory statement above, Petitioner has put forth no facts to support this "claim." He has failed to adequately identify the constitutional violation at issue. The Court presumes that by citing the Fourteenth Amendment, Petitioner is alleging a violation of the Due Process clause, but he has failed to cite the strand of due process law supporting his claim. The Court also notes that claims of error in the state post-conviction process are not cognizable on federal habeas review. *See Wright v. Angelone*, *supra*, 151 F.3d at 159

The Court is not required to construct Petitioner's claim for him. *See Small v. Endicott*, *supra*, 998 F.2d at 418. For the foregoing reasons, this "claim" is DISMISSED for failure to state a claim for relief on federal habeas review.

*CLAIM VI: Brady Claim*

Petitioner claims that the prosecutor failed to turn over to trial counsel information in the District Attorney's case file that was material to sentencing in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner asserts that the prosecutor failed to turn over a memo written by Brian Phelps, Executive Director of Sipes at the time of Bowie's trial. In the memo, Phelps gives some positive information about Bowie's time at Sipes and offers to provide additional information. (Pet's MAR Exhibit 1). This memo was hand-delivered to the District

Attorney's office by Phelps's assistant, Mitzi Gellman, who testified at the MAR hearing that she asked the receptionist in the DA's office to give it to the prosecutor in Bowie's case. The memo was discovered in the prosecutor's case file during post-conviction discovery. Petitioner also contends that the prosecutor failed to turn over evidence that,

> a house-parent at the boy's home was charged and convicted of a sex crime with one of Nathan Bowie's fellow residents; that resident's [sic] at the boy's home had been assaulted by staff, called "nigger" by staff, an official Guardian ad Litem report about the boy's home found it be an environment injurious to the welfare of the children.

(PWHC, p. 69)

To the extent that he raised these claims in his MAR, the MAR court rejected them on the merits. Because the MAR court correctly identified the governing legal standard as that set forth in *Brady v. Maryland,* this Court's review is limited to the question of whether that court's application of *Brady* was "objectively unreasonable." *See Williams*, 529 U.S. at 409.

In *Brady v. Maryland*, the United States Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused . . . where that evidence is material either to guilt or punishment . . . ." 373 US at 87. There are three elements that Petitioner must establish in order to prove a *Brady* violation: (1) the evidence must be favorable to Petitioner, "either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) the evidence must be material, *i.e.*, "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). In order to establish the "prejudice" component, Petitioner must show that "there was a reasonable

probability" that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense. *Strickler*, 527 U.S. at 263. In other words, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

The Court need not address elements one or three of the *Brady* test because Petitioner cannot show that the prosecution "suppressed" any of this evidence within the meaning of *Brady*. *Brady* places an affirmative duty on prosecutors "to learn of any favorable evidence known to others *acting on the government's behalf* in the case." *Kyles v. Whitley*, 514 U.S. at 437. (emphasis added). Although *Kyles* requires prosecutors to discover and disclose material, exculpatory evidence in the hands of police and others assisting or acting as agents of the prosecutor in a case, " '*Kyles* cannot be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.' " *United States v. Pelullo*, 399 F.3d 197, 216, 218 (3rd Cir. 2005) (citations omitted) (no *Brady* violation where Federal prosecutor had no knowledge of evidence in the hands of U.S. Dept. of Labor investigators uninvolved in investigation and prosecution of defendant); *accord United States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006) (Federal prosecutor had no duty under *Brady* to discover and disclose favorable information maintained by Rhode Island state courts when there was no evidence that the federal prosecutor or any agent working on her behalf had the information prior to or during trial.); *Moon v. Head*, 285 F.3d 1301, 1310 (11th Cir. 2002) (refusing to impute to a Georgia prosecutor knowledge of evidence in the possession of a Tennessee Bureau of Investigation agent because the agent was not part of the

"prosecution team" or acting on behalf of the prosecutor); *United States v. Morris*, 80 F.3d 1151,

1169 (7th Cir. 1996) (*Brady* did not require federal prosecutor to seek out allegedly exculpatory

information in the hands of the Office of Thrift Supervision . . . , the Securities Exchange

Commission . . . , or the Internal Revenue Service . . . when it had been unaware of the existence

of that information.); *United States v. Locascio*, 6 F.3d 924, 949-50 (2nd Cir. 1993) (refusing to

impute to a Federal prosecutor knowledge of evidence in the possession of FBI and other

investigative agents uninvolved in defendants case). Petitioner has presented no evidence that the

Catawba County DSS, the North Carolina DSS or the Guardian ad Litem, all of which had

investigated allegations of abuse at Sipes, were assisting or acting as agents of the prosecutor in

the prosecution of this case.

Furthermore, *Brady* "does not compel the disclosure of evidence available to the

defendant from other sources, including diligent investigation by the defense." *Stockton v.

Murray,* 41 F.3d 920, 927 (4th Cir. 1994) (citing *United States v. Wilson*, 901 F.2d 378, 380 (4th

Cir. 1990)). Had trial counsel conducted an adequate mitigation investigation, they would have

discovered all of the above listed evidence. While it is true that the prosecution did not disclose

the memo from Brian Phelps when it arguably should have, Mitzi Gellman testified that the reason

the memo was given to the prosecutor was because she and Brian Phelps wanted to help Bowie,

and they had received no response to their overtures to defense counsel. In fact, Gellman testified

that she mailed the same letter to Portwood and only took a copy of the letter to the DA because

she received no response from Portwood. Gellman also testified that she had left messages for

Portwood at his office offering both her and Phelps's help for Bowie. Had Portwood or Killian

responded to these overtures, they would have learned everything in the memo and more.

61

Additionally, Petitioner signed releases so that his trial counsel could obtain copies of his records from Sipes, but counsel failed to submit them.

Furthermore, Joanne Sigmon, Brian Phelps, and Lydia Anglin were aware of the criminal charges against and the conviction of former house parent, Walton Dacus Haining, for committing crimes against nature and taking indecent liberties with one of the residents of Sipes. Had trial counsel interviewed any of them or reviewed Joanne Sigmon's records, they would have learned of this information. Finally, had they spoken to Petitioner's Guardian ad Litem and Claudia or Jack Norman, they would have learned of other allegations of abuses at Sipes. For the foregoing reasons, the MAR courts rejection of this claim was not an unreasonable application of *Brady*.

*CLAIM VII: Prosecutorial Misconduct*

Petitioner claims that,

"the prosecutor should have known his arguments to the jury concerning no witnesses from Sipes, vouching for Shuford and vouching for the reputation of Sipe's based upon what was in the District Attorney's case files, were false in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States."

(PWHC, p. 22, ¶ 45; p. 68. ¶169. Petitioner has failed to cite any case law to support his due process claim.

Petitioner also has failed to provide any factual basis to support his contention that "the prosecutor should have known his arguments to the jury concerning no witnesses from Sipes . . . were false . . . ." In fact, he has failed to identify what it is that the prosecutor said, much less why it was false. In short, Court is not sure what it is that it is being asked to address. Because Petitioner's assertion, as presented in this portion of his claim, is conclusory, and Petitioner has

provided no factual or legal basis to support it, it is DISMISSED for failure to adequately state a claim on federal habeas review.

The same goes for Petitioner's contention that "the prosecutor should have known his arguments to the jury . . . vouching for the reputation of Sipes's based upon what was in the District Attorney's case files, were false . . . ." Once again, Petitioner has failed to identify what it is that the prosecutor said. Nor has he identified for the Court what was in the DA's files that made what he said false. As noted previously, the Court is not required to construct Petitioner's claim for him. *See Small v. Endicott*, 998 F.2d at 418. Because Petitioner's contention, as presented in this portion of his claim, is conclusory and Petitioner has provided no factual or legal basis to support it, it is DISMISSED for failure to adequately state a claim on federal habeas review.

As for Petitioner's assertion that "the prosecutor should have known his arguments to the jury concerning . . . vouching for Shuford were false . . . ," Petitioner has presented some factual evidence that Shuford had a criminal record, including one or two convictions for Assault on a Female. Additionally, he identified the portion of the prosecutor's speech that is at issue: "[D]id anybody tell you what [Shuford and Wilson's] reputation was? They were always decent guys that I know of." (Trial Vol. 5, p. 358)

"A prosecutor may neither vouch for nor bolster the testimony of a government witness in arguments to the jury." *See U.S. v.Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006) (citing *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997). A prosecutor likewise may not personally vouch for nor bolster the reputation of a witness or victim. In this case, the prosecutor vouched

for the reputations of Shuford and Wilson by stating that "they were always decent guys that I know of." He also implied that he was aware of evidence not known to the jury, when discussing Shuford's probation status: "Well, didn't they say something about Nelson being on probation? Probation for what? It sure wasn't for rape. What did they want to make him out to be? A rapist." Although evidence that Shuford was on probation at the time of his murder came out at trial, no evidence was presented regarding why he was on probation.

"Misconduct by a prosecutor in closing argument may be grounds for reversing a conviction." *Arnold v. Evatt*, 113 F.3d 1352, 1358 (4th Cir. 1997) *(*citing *Berger v. United States*, 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). However, the fact that a prosecutor's comments were "undesirable or even universally condemned" is not sufficient to overturn a conviction. *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986). Instead, the reviewing court must determine whether the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871-72, 40 L.Ed.2d 431 (1974)). This determination requires the reviewing court to look at "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Boyd v. French*, 147 F.3d 319, 329 (4th Cir.1998) (internal quotation marks omitted).

In this case, the prosecutor's remarks came during closing arguments at the guilt/innocence phase. The prosecutor's argument was in response to questions defense counsel had asked several of the state's witnesses regarding whether Rochelle Bowie had been raped by Shuford and Wilson several weeks before the shootings. His comment about Shuford and Wilson

being "decent guys" was isolated and came in the broader context of his argument that no evidence had been presented at trial that Rochelle had been raped by Shuford or Wilson. No objection was made to the prosecutor's remark, and the trial court instructed the jurors on several occasions that they were to be guided by their own recollections of the evidence. There was overwhelming evidence that Bowie and William killed Shuford and Wilson. Furthermore, there was no evidence that either victim was armed or that either had a reputation in the community for violence. Additionally, the jury had heard evidence that Shuford was on probation because his probation officer's card was found in his wallet. They also heard that Wilson had fired one shot in the air after the argument between Shuford and Rochelle.

Based upon the foregoing, the Court concludes that the prosecutor's remark that "[Shuford and Wilson] were always decent guys that I know of" did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. at 181. The MAR court's rejection of this claim was not contrary to or an unreasonable application of established Federal law.

*CLAIM VIII: Court's Adoption of State's Proposed Order*

Petitioner claims that he was deprived of his due process rights under the Fourteenth Amendment when the MAR court adopted the State's proposed final Order denying his MAR without giving him an opportunity to respond to the proposed opinion. Petitioner acknowledges that he also was given the opportunity to submit a proposed final Order and that he submitted his proposed Order a month before the State submitted its proposed final Order. Evidence has been introduced into the habeas record by way of affidavit of Steven R. Edelstein, Petitioner's habeas

counsel, that the State's attorney did not read Petitioner's proposed Order prior to submitting the State's proposed Order. The MAR court adopted the State's proposed Order without change.

This claim is not cognizable on federal habeas review. As noted previously, under § 2254, a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Bowie is not in custody because the MAR court violated his constitutional rights; he is in custody because he was tried, convicted and sentenced to death at a criminal trial. Because this claim challenges only the constitutionality of the procedures employed in the state post-conviction proceedings and not the constitutionality of his conviction and sentence, it cannot provide a basis for federal habeas relief. *See Wright v. Angelone*, *supra*, 151 F.3d at 159 (citing *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) ("[C]laims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief")); *see also Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir.) (denying certificate of appealability on petitioner's claim that he was denied due process when state post-conviction court adopted state's proposed findings and conclusions three hours after they were filed with court, noting that claim provided no grounds for federal habeas relief), *cert. denied*, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999). Because this claim states no grounds for relief on federal habeas review, it is DENIED.

CONCLUSION

For the foregoing reasons it is hereby ORDERED THAT:

The Petition for Writ of Habeas Corpus is DENIED [Doc. 3];

The State's Motion for Summary Judgment is GRANTED [Doc. 11];

Petitioner's August 6, 2004 Motion to Amend his Petition by Interdelineation is DENIED [Doc. 12];

Petitioner's Motion for Discovery is DENIED [Doc. 13];

Petitioner's Motion to Continue Consideration of the State's Motion for Summary Judgment is DENIED [Doc. 23];

Petitioner's Motion for Leave to File a Substitute Affidavit of Steven R. Edelstein is GRANTED [Doc. 26], and

Petitioner's September 16, 2004 Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus by Interdelineation is DENIED [Doc. 27].

Signed: September 29, 2006

Frank D. Whitney
United States District Judge